UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUSTIN ALBRIGHT on behalf of his daughter
T.A. a minor,

                        Plaintiff,        **COMPLAINT FOR DAMAGES AND JURY DEMAND**

vs.

DAILY HARVEST, INC. and JOHN DOE
CORPORATIONS 1-5,                  Civil Action No.:

                        Defendants.

---

## INTRODUCTION

Plaintiff Justin Albright, on behalf of his minor daughter T.A., by and through his attorneys, Heisman Nunes & Hull LLP and Marler Clark, LLP PS, alleges upon information and belief as follows:

## PARTIES

1.1   The Plaintiff is a resident of Tulsa, Oklahoma in the County of Tulsa, and is therefore a citizen of the State of Oklahoma.

1.2   Plaintiff is the parent and legal guardian of T.A. who is under 18 years of age and thus a minor.

1.3   T.A. consumed an adulterated and/or contaminated food product, namely prepared "French Lentil + Leek Crumbles," manufactured, packaged, distributed and sold by Defendant Daily Harvest, Inc.

1.4   Defendant Daily Harvest, Inc., (hereinafter "Defendant" or "Daily Harvest") is incorporated in the State of Delaware with headquarters and principal place of business located at 1115 Broadway, Suite 1105, New York, NY 10010, in the County of New York, and is therefore

a citizen of both the State of Delaware and the State of New York and subject to the personal jurisdiction in this Court.

1.5 Defendant Daily Harvest manufactured, packaged, distributed, and/or sold an adulterated and/or contaminated food product, namely "French Lentil + Leek Crumbles," to T.A.'s mother. On information and belief, Daily Harvest also developed the recipe for the prepared food product that caused T.A.'s injuries as alleged in this complaint.

1.6 Defendants John Doe Corporations 1-5, inclusive, whose identities are currently unknown, are manufacturers, distributors, importers, packagers, brokers, and/or growers of the "French Lentil + Leek Crumbles" product, and/or its constituent ingredients, that caused T.A.'s illness as well as the illnesses of other individuals sicked as a result of the subject outbreak. These defendants are in some manner responsible for the acts, occurrences, and transactions set forth herein, and/or are the partners and/or alter ego(s) of the Defendant(s) named herein, and therefore are legally liable to T.A. Plaintiff will set forth the true names and capacities of the fictitiously named Doe Defendants together with appropriate specific charging allegations when ascertained.

## JURISDICTION AND VENUE

2.1 This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1332(a) because the matter in controversy exceed $75,000.00 exclusive of costs and it is between citizens of different states.

2.2 Venue in the United States District Court of the Southern District of New York is proper pursuant to 28 U.S.C. section 1391(b)(1) because Defendant's principal place of business is located within the district and because the Defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of this action.

## GENERAL ALLEGATIONS

### The 2022 Outbreak Linked to Daily Harvest French Lentil + Leek Bowls

3.1     According to the U.S. Food and Drug Administration, on June 19, 2022, Defendant Daily Harvest instituted a voluntary recall of approximately 28,000 units of French Lentil + Leek Crumbles produced between April 28 and June 17, 2022.

3.2     More than 470 instances of consumers experiencing illness or adverse reactions after consumption of the French Lentil + Leek Crumbles have been reported. The consumption of Defendants' products has caused an array of serious health complications, from gastrointestinal illness to liver and gallbladder dysfunction.

3.3     Daily Harvest has stated that the approximately 28,000 units of the product were distributed to customers in the United States through direct online sale and through retail sales at stores in Chicago and Los Angeles. Daily Harvest also provided samples to a small number of customers and social media influencers.

3.4      The French Lentil + Leek Crumbles was a frozen, pre-made product packaged in a 12 oz. white pouch with the Daily Harvest logo at the top, "CRUMBLES" printed immediately below, and "French Lentil + Leek" printed in bold.

3.5     All lots of the French Lentil + Leek Crumbles product were ultimately recalled by Defendant Daily Harvest.

### Facts Relating to Defendant's Manufacture, Packaging, Distribution, and Sale of Contaminated, Defective Food Products that Caused Plaintiff's Injuries

3.6     On April 28, 2022, Daily Harvest announced the launch of the "Crumbles" product line, including the now-recalled French Lentil + Leek Crumbles.

3.7     Daily Harvest marketed these French Lentil + Leek Crumbles as a convenient, pre-made item that, after sauteing, can be added to other products, including those produced and

marketed by the Daily Harvest, for a complete meal. Daily Harvest marketed the Crumbles as "planet-friendly to add more nourishing plant protein into" customers' diets.

3.8     Daily Harvest's promotional materials state (as quoted here) that a "team of chefs and nutritionists" created the French Lentil + Leek Crumbles recipe, and that the product was an "easy to prepare and ready in minutes" way to lower customers' carbon footprint, and potentially "help you live longer."

3.9     Daily Harvest claims to work directly with farmers to grow organic products and "increase biodiversity" while avoiding synthetic chemicals.

3.10    Daily Harvest distributes and sells directly all of its products, including the French Lentil + Leek Crumbles, to customers through online sales, through its own standalone retail stores in Chicago and Los Angeles. Additionally, Daily Harvest provides samples to a small number of customers, including social media influencers, to increase visibility and, ultimately, sales of the products.

3.11    The French Lentil + Leek Crumbles that T.A. consumed was purchased through online subscription by her mother and delivered on June 3, 2022. The product was contaminated and caused T.A.'s injuries described below.

3.12    The French Lentil + Leek Crumbles consumed by T.A. contained contaminated ingredients, manufactured, packaged, distributed and/or sold by the Defendants.

3.13    T.A.'s mother Meghan Albright was the sole subscriber to Daily Harvest, and therefore may be subject to an arbitration agreement present in Daily Harvest's terms of use.

3.14    The essential rule governing the validity of arbitration agreements under NY law is that "[a] party to an agreement may not be compelled to arbitrate its dispute with another unless the evidence establishes the parties' clear, explicit and unequivocal agreement to

arbitrate." *Friedman v Goldstein*, 189 A.D.3d 1183 (2d Dept 2020), quoting *God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP*, 6 NY3d 371, 374 (2006). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit" *Lobel v. CCAP Auto Lease, Ltd.*, 2022 N.Y. Misc. LEXIS 1231, 164 N.Y.S.3d 807 (Sup Ct, Westchester Co 2022) quoting *Matter of Monarch Consulting, Inc. v National Union Fire Ins. Co. of Pittsburgh, PA*, 26 NY3d 659 (2016); *see also, Matter of County of Rockland v Primiano Constr. Co.*, 51 NY2d 1, 9 (1980).

3.15    Neither T.A., a minor incapable of being bound by a contract, nor her father, Justin Albright, on her behalf, who did not sign or benefit from Meghan Albright's contract with Daily Harvest, are subject to arbitration with Daily Harvest.

## T.A.'S ILLNESS

4.1    On June 3, 2022, Defendants' French Lentil + Leek Crumbles, purchased by Meghan Albright through online subscription from Daily Harvest, were delivered to Meghan Albright. T.A. consumed the product on the evening of June 3, 2022. Later that day, T.A. began experiencing abdominal pain and gastrointestinal distress.

4.2    T.A.'s symptoms persisted for several days, at which point Plaintiff scheduled an appointment with T.A.'s pediatrician. On June 10, 2022, T.A was seen by her pediatrician who ordered several lab tests including tests of T.A.'s thyroid and liver enzyme levels. Plaintiff and T.A. were later informed that T.A.'s thyroid and liver levels were elevated.

4.3    In the early hours of June 11, 2022, T.A. was awakened by yet worse abdominal pain and gastrointestinal distress, which persisted at elevated levels for the following two days.

4.4    On June 13, 2022, T.A. was again seen by her pediatrician who ordered more testing and an ultrasound and referred T.A. to a pediatric gastrointestinal and liver specialist.

4.5     On June 17, 2022, T.A. was seen by Dr. Michael Morris, a gastrointestinal and liver specialist, who informed Plaintiff and T.A. that the elevated liver enzyme levels could indicate potential lifelong, life-threatening illness. Plaintiff and T.A. were also advised that T.A. could no longer participate in soccer, her passion, as an inflamed liver could lacerate while playing and be fatal to T.A.

4.6     T.A.'s liver function continues to be monitored through blood draws.

4.7     T.A. has sustained serious personal injuries; suffered, and will continue to suffer, significant pain and other physical discomfort; incurred, and will continue to incur, substantial medical expenses; and remains at risk for future health complications with damages far in excess of $75,000.00, the jurisdictional threshold of this court.

## CAUSES OF ACTION

### Strict Liability – Count I

5.1     Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 4.7.

5.2     At all times relevant hereto, the Defendants were the manufacturer, packager, distributor and/or seller of the contaminated food product that was purchased and consumed by T.A.

5.3     The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use by the intended public, including T.A., because Defendants' product was contaminated by a substance injurious to human health.

5.4     The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was delivered to the Meghan Albright without any change in its defective

condition. The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was consumed by T.A. in the manner expected and intended.

5.5     The Defendants owed a duty of care to the public, including T.A., to manufacture, package, distribute and/or sell food that was not contaminated, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendants breached this duty.

5.6     The Defendants owed a duty of care to the public, including T.A., to manufacture, package, distribute and/or sell food that was fit for human consumption, and that was safe to consume to the extent contemplated by a reasonable consumer. The Defendants breached this duty.

5.7     As a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated food product that the Defendants manufactured, packaged, distributed and/or sold, as set forth above, T.A. sustained injuries and damages in an amount to be determined at trial.

## Breach of Warranty – Count II

5.8     Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.7.

5.9     The Defendants are liable to the Plaintiff for breaching express and implied warranties that they made regarding its food product that Meghan Albright purchased and T.A. consumed. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food it manufactured, packaged, distributed and/or sold was fit for human consumption and not otherwise adulterated, contaminated or injurious to health.

5.10     The contaminated food that the Defendants sold and T.A. consumed would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

5.11     The contaminated food sold to Meghan Albright was not fit for the uses and purposes intended, *i.e.,* human consumption; thus, the sale of this product to Meghan Albright constituted a breach of the implied warranty of fitness for its intended use.

5.12     As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, T.A. sustained injuries and damages in an amount to be determined at trial.

### Negligence – Count III

5.13     Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.12.

5.14     Defendants owed to T.A. a duty to use reasonable care in the manufacture, packaging, distribution, and/or sale of their food product, the observance of which duty would have prevented or eliminated the risk that Defendants' food product would become contaminated with any dangerous pathogen.  Defendants, however, breached this duty and were therefore negligent.

5.15     Defendants had a duty to comply with all federal, state and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and were therefore negligent.  T.A. was among the class of persons designed to be protected by these statutes, laws, regulations, safety codes and provisions pertaining to the manufacture, packaging, distribution, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

5.16     Defendants had a duty to properly supervise, train, and monitor their respective employees, and to ensure that their respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, packaging, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

5.17     Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions and that were clean, free from adulteration, and safe for human consumption. Defendants, however, breached this duty and were therefore negligent.

5.18     As a direct and proximate result of Defendants' negligence as described above, T.A. sustained injuries and damages in an amount to be determined at trial.

### Negligence *Per Se* – Count IV

5.19     Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.18.

5.20     Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of their food product, including the requirements of the New York State's Agriculture and Markets Law and the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*).

5.21     In breach of this duty, Defendants failed to comply with the provisions of the health and safety acts identified above, and, as a result, were negligent *per se* in its manufacture, distribution, packaging and/or sale of adulterated food.

5.22    As a direct and proximate result of conduct by Defendants that was negligent *per se*, T.A. sustained injuries and damages in an amount to be determined at trial.

## DAMAGES

6.1    T.A. suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of Defendants, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to past and future pain and suffering, past and future damages for loss of enjoyment of life, past and future emotional distress, past and future medical and related expenses, including pharmaceutical expenses, travel and travel-related expenses, and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## JURY DEMAND

7.1    Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against the Defendants as follows:

A.    Ordering compensation for all general, special, incidental, and consequential damages suffered by T.A. because of Defendants' conduct.

B.    Awarding Plaintiff costs and expenses, including reasonable attorneys' fees to the fullest extent allowed by law; and

C.    Granting all such additional and/or further relief as this Court deems just and equitable.

DATED:    July 13, 2022
               Rochester, New York

**HEISMAN NUNES & HULL LLP**

By:    /s/Paul V. Nunes

Paul V. Nunes, Esq.
Bar No.: PN2853
69 Cascade Drive
Suite 102
Rochester, New York 14614
Telephone: (585) 270-6922
pnunes@hnhattorneys.com

**MARLER CLARK, LLP, PS**

By:    /s/ William D. Marler

William D. Marler, Esq., *pro hac vice* pending
The Standard Building
1012 1st Avenue, Fifth Floor
Seattle, Washington 98104
Telephone: (206) 346-1888
bmarler@marlerclark.com

*Attorneys for Plaintiff*