UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JUSTIN ALBRIGHT on behalf of his daughter T.A., a minor,<br><br>Plaintiff,<br><br>vs.<br><br>DAILY HARVEST, INC., and SECOND BITE FOODS, INC., d/b/a "STONE GATE FOODS", SMIRK'S LTD., AND JOHN DOE CORPORATIONS 1-5,<br><br>Defendants. | **SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND**<br><br>Civil Action No.: 22-cv-05987 |

---

## INTRODUCTION

Plaintiff Justin Albright, on behalf of his minor daughter T.A., by and through his attorneys, Heisman Nunes & Hull LLP and Marler Clark, LLP PS, alleges upon information and belief as follows:

## PARTIES

1.1   The Plaintiff is a resident of Tulsa, Oklahoma, in the County of Tulsa, and is therefore a citizen of the State of Oklahoma.

1.2   Plaintiff is the parent and legal guardian of T.A. who is under 18 years of age and thus a minor. T.A. is also a citizen of the State of Oklahoma.

1.3   T.A. consumed an adulterated and/or contaminated food product, namely prepared "French Lentil + Leek Crumbles," manufactured, packaged, distributed and sold by Defendant Daily Harvest, Inc.

1.4     Defendant Daily Harvest, Inc., (hereinafter "Defendant" or "Daily Harvest") is incorporated in the State of Delaware with its headquarters and principal place of business located at 1115 Broadway, Suite 1105, New York, NY 10010, in the County of New York, and is therefore a citizen of both the State of Delaware and the State of New York, and subject to the personal jurisdiction in this Court.

1.5     Defendant Daily Harvest manufactured, packaged, distributed, and/or sold an adulterated and/or contaminated food product, namely "French Lentil + Leek Crumbles," to T.A.'s mother. On information and belief, Daily Harvest also developed the recipe for the prepared food product that caused T.A.'s injuries as alleged in this complaint.

1.6     Defendant Second Bite Foods, Inc., d/b/a "Stone Gate Foods," (hereinafter "Defendant" or "Second Bite") is incorporated in the State of Minnesota with its principal place of business located at 5365 Shore Trail, Prior Lake, MN 55372. Therefore, Defendant Second Bite is a citizen of the State of Minnesota.

1.7     Defendant Second Bite owns and operates a manufacturing facility located at 4218 Valley Industrial Blvd. S. in Shakopee, MN. At this place of business, at all times relevant, Second Bite manufactured frozen fruits, juices, vegetables, and specialty foods, including specialty foods and other foodstuffs for Defendant Daily Harvest. Second Bite manufactured, for Daily Harvest, the French Lentil + Leek Crumbles product that is the source of the subject outbreak and was the cause of the minor Plaintiff's illness and injuries.

1.8     Defendant Smirk's Ltd. (hereinafter "Defendant" or "Smirk's") is a limited liability company formed under the laws of the State of Colorado with its principal place of business located at 17601 US Highway 34, Fort Morgan, CO 80701. Smirk's is therefore a citizen of the State of Colorado.

1.9     Defendant Smirk's owns and operates a specialty product supply shop, and at all times relevant, supplied tara flour to Defendant Second Bite for use in manufacturing the French Lentil + Leek Crumbles product that was identified as the source of the subject outbreak and was the cause of the minor Plaintiff's illness and injuries.

1.10    Defendants John Doe Corporations 1-5, inclusive, whose identities are currently unknown, are manufacturers, distributors, importers, packagers, brokers, and/or growers of the "French Lentil + Leek Crumbles" product, and/or its constituent ingredients, that caused T.A.'s illness as well as the illnesses of other individuals sickened as a result of the subject outbreak. These defendants are in some manner responsible for the acts, occurrences, and transactions set forth herein, and/or are the partners and/or alter ego(s) of the Defendant(s) named herein, and therefore are legally liable to T.A.. Plaintiff will set forth the true names and capacities of the fictitiously named Doe Defendants together with appropriate specific charging allegations when ascertained.

## JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1332(a) because the matter in controversy far exceeds $75,000.00 exclusive of costs and it is between citizens of different states.

2.2     Specifically, with respect to Defendant Second Bite, on information and belief, this Defendant manufactured the contaminated food items that are the subject of this action, with knowledge that the products would be distributed into the interstate marketplace, including to consumers in the States of Oklahoma and New York.

2.3     On its website located at www.stonegate-foods.com, Defendant Second Bite, which does business under its federally registered trademark STONE GATE FOODS, advertises itself as

"the go-to co-packaging facility and private label manufacturer for top brands throughout the United States." Defendant Second Bite knew, at all relevant times, that Defendant Daily Harvest was an online, subscription-based food manufacturing and delivery service with a national customer/client base. Defendant Second Bite has been in business for approximately 41 years, and states on its website, identified above, that it has "had the privilege to serve the retail, food service and private label customers throughout the country" for the entirety of this period.

2.4  As a result of its above-described knowledge; its intentional provision of specialty food manufacturing services to customers across the country; and its knowledge that the products that it manufactured for Defendant Daily Harvest would be distributed in the interstate marketplace, including to consumers in the State of New York, Defendant Second Bite has sufficient "minimum contacts" with the State of New York such that maintenance of this suit in this judicial district is appropriate, fair, and just.

2.5  With respect to Defendant Smirk's, on information and belief, Defendant Smirk's supplied tara flour, the ingredient identified by Defendant Daily Harvest as the contaminant in the French Lentil + Leek Crumbles, which were identified as the source of the subject outbreak. Smirk's did so with the knowledge that products containing that tara flour would be distributed into the interstate marketplace, including to consumers in the States of Oklahoma and New York.

2.6  On its website, located at www.smirks.com, Defendant Smirk's advertises "Just-in-time sourcing," claiming to store ingredients in one of its four warehouses across the United States, including one in Kearny, New Jersey, so that it can "get you the product when you need it, where you need it." Defendant Smirk's knew at all times relevant that Defendant Second Bite was a manufacturer of food products for top brands throughout the U.S., and that the tara flour Defendant Smirk's sold would be used in food products manufactured to be sold nationwide.

2.7     As a result of its above-described knowledge; its intentional provision of specialty food ingredients to customers across the country; and its knowledge that the product sold to Defendant Second Bite would be distributed in the interstate marketplace, including to consumers in the State of New York, Smirk's has sufficient "minimum contacts" with the State of New York such that maintenance of this suit in this court is appropriate, fair, and just.

2.8     Venue in the United States District Court of the Southern District of New York is proper pursuant to 28 U.S.C. section 1391(b)(1) because Defendant Daily Harvest's principal place of business is located within the district and because all defendants are subject to personal jurisdiction in this judicial district at the time of the commencement of this action.

## GENERAL ALLEGATIONS

### The 2022 Outbreak Linked to Daily Harvest French Lentil + Leek Crumbles

3.1     On June 17, 2022, Taylor from Defendant Daily Harvest sent an email to Daily Harvest consumers stating, in relevant part, "[a] small number of customers have reported gastrointestinal discomfort after consuming our French Lentil + Leek Crumbles. As included in our cooking instructions, lentils must be thoroughly cooked to an internal temperature of 165° F. Like some other legumes, raw lentils contain a type of protein that can cause gastrointestinal symptoms unless thoroughly cooked. While cooking lentils thoroughly is always recommended, out of an abundance of caution, please dispose of any French Lentil + Leek Crumbles you have received and do not eat them." This notification was published on Defendant Daily Harvest's website on June 19, 2022.

3.2     Another notification was posted to Defendant Daily Harvest's website on June 22, 2022, stating, in relevant part, "As soon as we received reports suggesting a possible link between the French Lentil + Leek Crumbles and an adverse reaction, we immediately took action and

launched a voluntary recall. We have reached out multiple times directly to consumers who received the product, instructing them to dispose of it and not eat it. If you have French Lentil + Leek Crumbles, please dispose of them and do not eat them. The last thing we'd want is for anyone else to be impacted. In parallel, we launched an investigation to identify the root cause of the health issues being reported. We're working closely with the FDA and with multiple independent labs to investigate this. We are working with a group of experts to help us get to the bottom of this—that includes microbiologists, toxin and pathogen experts as well as allergists."

3.3     On June 23, 2022, according to Defendant Daily Harvest, more than 470 instances of consumers experiencing illness or adverse reactions after consumption of the French Lentil + Leek Crumbles had been reported.

3.4     In an announcement posted to the U.S. Food and Drug Administration (FDA) website on June 23, 2022, the FDA announced that Defendant Daily Harvest instituted a voluntary recall of approximately 28,000 units of French Lentil + Leek Crumbles produced between April 28 and June 17, 2022.

3.5     An announcement on June 27, 2022, by Defendant Daily Harvest's founder and CEO, Rachel Drori, stated, in relevant part, "[w]e have spent the past ten days working with the FDA, state agencies and multiple independent labs, as well as experts in microbiology, food safety and toxicology to conduct testing. These tests cover common food-borne pathogens, toxins, and allergens. Results thus far have all come back negative. At this point, despite consulting with numerous experts, cooperating with FDA's investigation, working with our supply chain, and conducting extensive testing, we have not yet identified a cause. I also want to reassure you that this issue is limited to our French Lentil + Leek Crumbles and does not impact any of our other 100+ menu items." Additional updates were published on July 1, 2022, and July 12, 2022,

confirming "that this issue is isolated to French Lentil + Leek Crumbles and does not impact any of our other 140+ items."

3.6     On July 19, 2022, founder and CEO of Defendant Daily Harvest, Rachel Drori, sent an email to Daily Harvest consumers stating, in relevant part, "we have identified tara flour as the cause of the issue. Our extensive investigation has involved many experts analyzing data from all sources. … Our investigation team will continue working with the FDA, the tara flour producer and others to help determine what specifically made people sick."

3.7     All lots of the French Lentil + Leek Crumbles product were ultimately recalled by Defendant Daily Harvest.

3.8     The consumption of Defendants' products has caused an array of serious health complications, from gastrointestinal illness to liver and gallbladder dysfunction.

**Facts Relating to Defendant's Manufacture, Packaging, Distribution, and Sale of Contaminated, Defective Food Products that Caused Plaintiff's Injuries**

3.9     On April 28, 2022, Defendant Daily Harvest announced the launch of the "Crumbles" product line, including the now-recalled French Lentil + Leek Crumbles.

3.10    Defendant Daily Harvest marketed these French Lentil + Leek Crumbles as a convenient, pre-made item that, after sauteing, can be added to other products, including those produced and marketed by the Daily Harvest, for a complete meal. Defendant Daily Harvest marketed the Crumbles as "planet-friendly to add more nourishing plant protein into" customers' diets.

3.11    Defendant Daily Harvest's promotional materials state (as quoted here) that a "team of chefs and nutritionists" created the French Lentil + Leek Crumbles recipe, and that the product was an "easy to prepare and ready in minutes" way to lower customers' carbon footprint and potentially "help you live longer."

3.12    Defendant Daily Harvest claims to work directly with farmers to grow organic products and "increase biodiversity" while avoiding synthetic chemicals.

3.13    Defendant Daily Harvest distributes and sells directly all of its products, including the French Lentil + Leek Crumbles, to customers through online sales, through its own standalone retail stores in Chicago and Los Angeles. Additionally, Defendant Daily Harvest provides samples to a small number of customers, including social media influencers, to increase visibility and, ultimately, sales of the products.

3.14    The French Lentil + Leek Crumbles that T.A. consumed was purchased through online subscription by her mother, Meghan Albright, and delivered on June 3, 2022. The product was contaminated and caused T.A.'s injuries described below.

3.15    The French Lentil + Leek Crumbles consumed by T.A. contained contaminated ingredients manufactured, packaged, distributed and/or sold by the Defendants, including Defendants Daily Harvest, Second Bite, and Smirk's.

3.16    The Defendants John Doe Corporations 1-5 are entities that either manufactured and distributed the French Lentil + Leek Crumbles product, or manufactured, distributed, imported, packaged, brokered, or grew and harvested the contaminated ingredients used in the manufacture of the French Lentil + Leek Crumbles product that caused T.A.'s illness and the subject outbreak.

## T.A.'s Illness

4.1    On June 3, 2022, Defendants' French Lentil + Leek Crumbles, purchased by Meghan Albright through online subscription from Daily Harvest, were delivered to Meghan Albright. T.A. consumed the product on the evening of June 3, 2022. Later that day, T.A. began experiencing abdominal pain and gastrointestinal distress.

4.2     T.A.'s symptoms persisted for several days, at which point Plaintiff scheduled an appointment with T.A.'s pediatrician. On June 10, 2022, T.A was seen by her pediatrician who ordered several lab tests including tests of T.A.'s thyroid and liver enzyme levels. Plaintiff and T.A. were later informed that T.A.'s thyroid and liver levels were elevated.

4.3     In the early hours of June 11, 2022, T.A. was awakened by yet worse abdominal pain and gastrointestinal distress, which persisted at elevated levels for the following two days.

4.4     On June 13, 2022, T.A. was again seen by her pediatrician who ordered more testing and an ultrasound and referred T.A. to a pediatric gastrointestinal and liver specialist.

4.5     On June 17, 2022, T.A. was seen by Dr. Michael Morris, a gastrointestinal and liver specialist, who informed Plaintiff and T.A. that the elevated liver enzyme levels could indicate potential lifelong, life-threatening illness. Plaintiff and T.A. were also advised that T.A. could no longer participate in soccer, her passion, as an inflamed liver could lacerate while playing and be fatal to T.A.

4.6     T.A.'s liver function continues to be monitored through blood draws.

4.7     T.A. has sustained serious personal injuries; suffered, and will continue to suffer, significant pain and other physical discomfort; incurred, and will continue to incur, substantial medical expenses; and remains at risk for future health complications with damages far in excess of $75,000.00, the jurisdictional threshold of this court.

## CAUSES OF ACTION

### Strict Liability – Count I

5.1     Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 4.7.

5.2 At all times relevant hereto, the Defendants were the manufacturer, packager, distributor and/or seller of the contaminated food product that was purchased and consumed by T.A.

5.3 The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use by the intended public, including T.A., because Defendants' product was contaminated by a substance injurious to human health.

5.4 The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was delivered to Meghan Albright without any change in its defective condition. The contaminated food product that the Defendants manufactured, packaged, distributed, and/or sold was consumed by T.A. in the manner expected and intended.

5.5 The Defendants owed a duty of care to the public, including T.A., to manufacture, package, distribute and/or sell food that was not contaminated, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendants breached this duty.

5.6 The Defendants owed a duty of care to the public, including T.A., to manufacture, package, distribute and/or sell food that was fit for human consumption, and that was safe to consume to the extent contemplated by a reasonable consumer. The Defendants breached this duty.

5.7 As a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated food product that the Defendants manufactured, packaged, distributed and/or sold, as set forth above, T.A. sustained injuries and damages in an amount to be determined at trial.

### Breach of Warranty – Count II

5.8   Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.7.

5.9   The Defendants are liable to the Plaintiff for breaching express and implied warranties that they made regarding its food product that Meghan Albright purchased and T.A. consumed. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food they manufactured, packaged, distributed and/or sold was fit for human consumption and not otherwise adulterated, contaminated, or injurious to health.

5.10   The contaminated food that the Defendants sold and T.A. consumed would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

5.11   The contaminated food sold to Meghan Albright was not fit for the uses and purposes intended, *i.e.,* human consumption; thus, the sale of this product to Meghan Albright constituted a breach of the implied warranty of fitness for its intended use.

5.12   As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, T.A. sustained injuries and damages in an amount to be determined at trial.

### Negligence – Count III

5.13   Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.12.

5.14   Defendants owed to T.A. a duty to use reasonable care in the manufacture, packaging, distribution, and/or sale of their food product, the observance of which duty would

have prevented or eliminated the risk that Defendants' food product would become contaminated with any dangerous pathogen. Defendants, however, breached this duty and were therefore negligent.

5.15    Defendants had a duty to comply with all federal, state and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and were therefore negligent. T.A. was among the class of persons designed to be protected by these statutes, laws, regulations, safety codes and provisions pertaining to the manufacture, packaging, distribution, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

5.16    Defendants had a duty to properly supervise, train, and monitor their respective employees, and to ensure that their respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, packaging, and sale of similar food products. Defendants, however, breached this duty and were therefore negligent.

5.17    Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions and that were clean, free from adulteration, and safe for human consumption. Defendants, however, breached this duty and were therefore negligent.

5.18    As a direct and proximate result of Defendants' negligence as described above, T.A. sustained injuries and damages in an amount to be determined at trial.

### Negligence *Per Se* – Count IV

5.19    Plaintiff repeats and realleges all of the above allegations contained in paragraphs 1.1 through 5.18.

5.20    Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of their food product, including the requirements of the New York State's Agriculture and Markets Law and the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*).

5.21    In breach of this duty, Defendants failed to comply with the provisions of the health and safety acts identified above, and, as a result, were negligent *per se* in their manufacture, distribution, packaging and/or sale of adulterated food.

5.22    As a direct and proximate result of conduct by Defendants that was negligent *per se*, T.A. sustained injuries and damages in an amount to be determined at trial.

### DAMAGES

6.1    T.A. suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of Defendants, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to past and future pain and suffering, past and future damages for loss of enjoyment of life, past and future emotional distress, past and future medical and related expenses, including pharmaceutical expenses, travel and travel-related expenses, and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

### JURY DEMAND

7.1    Plaintiff hereby demands a jury trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against the Defendants as follows:

A.  Ordering compensation for all general, special, incidental, and consequential damages suffered by T.A. because of Defendants' conduct.

B.  Awarding Plaintiff costs and expenses, including reasonable attorneys' fees to the fullest extent allowed by law; and

C.  Granting all such additional and/or further relief as this Court deems just and equitable.

DATED:   August 18, 2022
         Rochester, New York

                                **HEISMAN NUNES & HULL LLP**

By:   /s/ Paul V. Nunes
      Paul V. Nunes, Esq.
      Bar No.: PN2853
      69 Cascade Drive
      Suite 102
      Rochester, New York 14614
      Telephone: (585) 270-6922
      pnunes@hnhattorneys.com

                                **MARLER CLARK, LLP, PS**

By:   /s/ William D. Marler
      William D. Marler, Esq., *pro hac vice* pending
      The Standard Building
      1012 1st Avenue, Fifth Floor
      Seattle, Washington 98104
      Telephone: (206) 346-1888
      bmarler@marlerclark.com

*Attorneys for Plaintiff*